# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

JOE HEDRICK,              )
                                  )
               Plaintiff,       )
vs.                                  )          NO. CIV-08-0437-HE
                                  )
WEYERHAEUSER COMPANY, ET AL., )
                                  )
             Defendants.     )

## ORDER

In this action, plaintiff Joe Hedrick seeks benefits under the long term disability plan ("LTD Plan" or "Plan") offered by his previous employer, Weyerhaeuser Company, and administered and insured by defendant, Unum Life Insurance Company ("Unum"). Hedrick brings the action under the Employee Retirement Income Security Act of 1975 ("ERISA"). 29 U.S.C. § 1001 et seq. Specifically, 29 U.S.C. § 1132(a)(1)(B) allows a plan participant to bring a civil action "to recover benefits due to him under the terms of his plan." Hedrick challenges Unum's denial of his claim for LTD benefits through that provision. The chief issue here is whether Hedrick was "unable to safely and completely perform 2 **activities of daily living** without another person's assistance or verbal cueing" — a condition-precedent to recovery under the LTD Plan. R. at 945 (emphasis in original, bolded terms are "defined" terms within the Policy).[1]

## Standard of Review

---

[1]*The Administrative Record is cited as "R." followed by the page number.*

The Supreme Court recently explained the appropriate standard of review for cases contesting a benefit determination under an ERISA plan in  Metropolitan Life Insurance Co. v. Glenn, ___ U.S. ___, 128 S.Ct. 2343 (2008).  Acknowledging its prior holding in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Court recognized that, as a general rule, a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed *de novo*.  Glenn, 128 S.Ct. at 2348.  However, where the benefit plan gives the fiduciary or administrator discretionary authority to determine eligibility for benefits or to construe plan term, as is frequently the case, courts are to review decisions of the plan administrator under an arbitrary and capricious standard.[2] *Id.*; Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 379–80 (10th Cir.1992).  The parties here agree that Unum's denial of benefits is reviewed under an arbitrary and capricious standard because the LTD Plan gives Unum discretionary powers.[3]

Under the arbitrary and capricious standard of review, the court "will uphold an administrator's decision unless it is not grounded on *any* reasonable bases."  Graham v. Hartford Life & Accident Insur. Co., 589 F.3d 1345, 1358 (10th Cir. 2009) (internal citation and quotation marks omitted) (emphasis in original).  "Certain indicia of an arbitrary and capricious denial of benefits include 'lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.'"  *Id.* (quoting Caldwell v. Life Ins. Co. of N. Am.,

---

[2]*In Fought v. Unum Life Insurance Co. of America, 379 F.3d 997, 1003 n.2 (10th Cir. 2004), the Tenth Circuit noted that it "treat[s] the terms 'arbitrary and capricious' and 'abuse of discretion' as interchangeable in this context."*

[3]*The Plan states, "When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."  R. at 496.*

287 F.3d 1276, 1282 (10th Cir. 2002)).  Here, the plaintiff points to both a lack of substantial

evidence supporting the denial of his LTD claim as well as Unum's conflict of interest as

support for overturning Unum's denial of benefits.

The Graham court defined "substantial evidence" as "such evidence that a reasonable

mind might accept as adequate to support the conclusion reached by the decision maker. . . .

more than a scintilla but less than a preponderance."  Graham, 589 F.3d at 1358 (internal

citation and quotation marks omitted).

In Firestone the Supreme Court indicated in dicta that, where a plan administrator

operates under a conflict of interest, the "conflict must be weighed as a factor in determining

whether there is an abuse of discretion."  Firestone, 489 U.S. at 115.  In Glenn, the Court set

out to explain that indication:

> We believe that Firestone means what the word "factor" implies, namely, that
> when judges review the lawfulness of benefit denials, they will often take
> account of several different considerations of which a conflict of interest is
> one. . . . In such instances, any one factor will act as a tie-breaker when the
> other factors are closely balanced, the degree of closeness necessary depending
> upon the tiebreaking factor's inherent or case specific importance. . . . [F]or
> example, [a] conflict of interest should prove more important (perhaps of great
> importance) where circumstances suggest a higher likelihood that it affected
> the benefits decision. . . . It should prove less important (perhaps to the
> vanishing point) where the administrator has taken active steps to reduce
> potential bias and to promote accuracy.

Glenn, 128 S.Ct. at 2351.

The Tenth Circuit applied this approach in Weber v. GE Group Life Assurance Co.,

541 F.3d 1002, 1010 (10th Cir. 2008).  In Weber, the court considered the "sliding-scale

approach" it had previously developed to appropriately "decrease the level of deference

3

given" to conflicted plan administrators under the arbitrary and capricious standard.  *Id.*

Under that approach, the deference given is "decrease[d] . . . in proportion to the seriousness

of the conflict," creating "in effect a sliding scale of judicial review" of plan administrator

decisions.  Fought, 379 F.3d at 1044 (internal citation and quotation marks omitted).  The

Weber court concluded that the sliding-scale approach "mirrors the Glenn Court's method

of accounting for the conflict-of-interest factor."  Weber, 541 F.3d at 1010–11.  In Holcombe

v. Unum Life Insurance Co., 578 F.3d 1187, 1192 (10th Cir. 2009), the court interpreted

Glenn's approach as "a 'combination-of-factors method of review' that allows judges to take

account of several different case-specific factors, reaching a result by weighing all together."

*Id.* at 1193 (citation and internal quotation marks omitted).  The Tenth Circuit has further

explained, "The importance we attach to the existence of a conflict of interest is

proportionate to the likelihood that the conflict affected the benefits decision."  Graham, 589

F.3d at 1358.  Although preserving the "sliding-scale," the Tenth Circuit in Holcombe,

abandoned the burden-shifting element that was previously a part of that approach — a

practice "Glenn expressly rejects."


## Background[4]

### A. The LTD Plan

The court begins by reviewing the controlling Plan terms.  Joe Hedrick participated

---

[4]*Review is confined to the administrative record.  Sandoval, 967 F.2d at 380.*

in the LTD Plan offered by Weyerhaeuser, which was funded by an insurance policy underwritten by Unum. Unum administered the plan and had discretionary authority to construe policy terms and determine eligibility for benefits. R. at 496.

The Plan sets out certain requirements for the recovery of benefits. Before a plan participant can begin receiving benefit payments he must be "continuously disabled" for 180 days (the "elimination period"). R. at 945. To be "disabled" under the Policy, a participant must be "limited from performing the material and substantial duties of [his or her] regular occupation due to . . . sickness or injury" and must "have a 20% or more loss in [his or her] indexed monthly earnings due to the same sickness or injury." *Id.* By making such a showing, a participant may collect LTD benefits for a period of 12 months following the end of the elimination period.

In order to collect benefits beyond 12 months, the participant must meet several additional requirements. Specifically, the Plan provides:

> You will continue to receive payments beyond 12 months if:
>
> - you are unable to safely and completely perform 2 **activities of daily living** without another person's assistance or verbal cueing; or
>
> - you are **cognitively impaired**; and . . .
>
> - you are not working, and due to your loss of activities of daily living or cognitive impairment, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

*Id.* (emphasis in original). The Policy goes on to define "activities of daily living" ("ADLs") to include six activities: bathing, dressing, toileting, transferring, continence, and eating. R.

at 966. The scopes of those ADLs are defined in the policy and further discussed below.

Although plaintiff argues that he is cognitively impaired as a result of his injury, the record provides virtually no support for that argument.[5] Nor, contrary to Unum's position, does the record contain substantial evidence suggesting that Hedrick is able "to perform the duties of any gainful occupation for which [he is] reasonably fitted by education, training, or experience."[6] Thus, the chief issue here is whether the plaintiff is "unable to safely and completely perform 2 **activities of daily living** without another person's assistance or verbal cueing."

## B. Procedural History

Joe Hedrick was employed by Weyerhaeuser as a millwright from 1986 through 2004. In March 2004, Hedrick was injured on the job and, after March 29, was no longer able to perform the duties of his position with Weyerhaeuser, which involved mostly physical labor. R. at 26. Hedrick began receiving LTD benefits under the Plan six months later, after the elimination period, in September 2004 and continued to receive payments for the initial 12 months. During that period, Unum collected medical records from Hedrick's treating physicians and Hedrick himself. In November 2005, Hedrick received a letter from Unum

---

[5]*The court is aware that physical therapist Shane Holcomb reported that he believed Hedrick to be "cognitively impaired." R. at 900–01. However, in light of significant other evidence suggesting that Hedrick was not cognitively impaired, there is no persuasive basis for the conclusion that Unum's decision was unreasonable in that regard.*

[6]*In fact, in awarding Hedrick disability benefits, an administrative law judge for the Social Security Administration ("SSA") found that Hedrick was "unable to perform even 'sedentary' activities, and considering [his] age, education, work experience, [and] residual functional capacity . . . there were no jobs existing in significant numbers that [he] could perform." R. at 1529.*

informing him that all subsequent LTD payments were being made "under Reservation of Rights" — meaning Unum did not concede present or future liability — while Unum investigated whether Hedrick met the additional requirements for receiving payments after 12 months. R. at 479. Unum completed its investigation and terminated Hedrick's benefit payments in October 2006, concluding that Hedrick had not lost the ability to independently complete at least two ADLs. R. at 863–67.

Hedrick appealed that decision and an internal "Medical Appeals Review" was conducted by Unum employee Andrew Krouskop, M.D. On February 17, 2007, Dr. Krouskop concluded, based on his review of Hedrick's medical file, that the records "do[] not support that the claimant is unable to safely and completely perform" any ADLs. R. at 1132. In March 2007, the case was referred for further review within Unum to consider additional records submitted by Hedrick. On March 19, Dr. Krouskop affirmed his prior decision and forwarded that report to another Unum doctor for "second-level physician review." R. at 1246.

On "second-level" review, Unum physician Thomas Davis, M.D., concluded:

Mr. Hedrick's ability or inability is not well documented regarding ADL. . . .
        . . . .
. . . I believe it is not presently knowable with the current available chart to make a conclusion with a reasonable degree of medical certainty. Four providers have noted ADL deficiency. One has recently added the phrase [temporarily totally disabled] but did not comment on ADL's but previously opined ability to perform ADL's and the other opining ability to perform ADL (Dr. Mackey) does not have a recent opinion since May 06.

R. at 1275–76. In light of this, Dr. Davis recommended that an "independent medical

examination" ("IME") be conducted "to determine if physical deficits exist which impair Mr. Hedrick's ability to perform the ADL's." R. at 1276. Unum scheduled Hedrick to undergo the IME with Roshan Sharma, M.D. On October 31, 2007, after reviewing the results of the IME, which concluded that Hedrick was able to perform all listed ADLs, Unum informed Hedrick that its prior decision to deny his claim for LTD benefits was upheld on appeal. R. at 1359.

In June 2007, the U.S. Social Security Administration ("SSA") approved Hedrick's claim for Social Security disability benefits. R. at 1395. At Hedrick's request, Unum agreed to review his claim in light of the SSA's decision. R. at 1384. On November 26, 2007, Unum notified Hedrick, for the final time, that his claim had been denied on appeal. R. at 1532.

## C. Medical Records

A court's review of a denial of benefits under § 1132(a)(1)(B) is limited to the administrative record, that is "the record before the plan administrator at the time it reached its decision." Sandoval, 967 F.2d at 380. The following is a summation of the relevant records and other evidence available to Unum at the time it issued its final denial of Hedrick's claim on November 26, 2007.[7]

---

[7]*The defendant's sometimes misleading characterizations of the facts in the record are concerning. In several instances, the defendant cites to portions of physicians' reports which, viewed in isolation, depict Hedrick as quite healthy, but which in context are part of a grimmer picture. See e.g. Def.'s Br. ¶¶ 9–10. At one point, the defendant simply misstates the record. A "Disability Claim" form completed by one of Hedrick's physicians and submitted to Unum describes a restriction on Hedrick's physical capacity: "No lifting, pushing, pulling > 5lbs." R. at 25 (emphasis added). The defendant, however, describes the document as reading "No lifting . . .*

8

On March 14, 2004, while at work for Weyerhaeuser, Hedrick fell into a pit and injured his back and neck. R. at 21. He continued working for a couple of weeks by taking medication, but aggravated the injury on March 29, and has not been able to work since that time.

It is not readily evident from the record which doctor Hedrick first saw for his injuries. The first clear report of his injuries comes from physiatrist Donald E. Adam, M.D., who Hedrick saw on June 8, 2004. R. at 152. At that appointment, Hedrick complained of pain in the neck, lower back, left arm, testicles, and legs. *Id.* Dr. Adams diagnosed Hedrick with degenerative disc disease and disc herniation, among other back problems. *Id.* Dr. Adams referred Hedrick to orthopedist Michael Wright, M.D., for a surgical consultation. *Id.* On July 13, Dr. Wright performed surgery on Hedrick to address these problems. R. at 147. At a post–operative follow-up on September 23, 2004, Dr. Wright stated that Hedrick "has essentially two problems": (1) "the first is an injury to the cervical spine [i.e. neck] with internal disc derangment at C5–6," (2) the "second problem is a low back injury." R. at 113. With regard to the first, cervical spine problem, Dr. Wright reported that the July 13 surgery produced "an excellent result" and that Hedrick's "upper extremity complaints have completely resolved." *Id.* As to the lower back problems, Dr. Wright reported that Hedrick continued to suffer from "significant pain" in the lower back and legs and was "released to

_____

*75lbs." The statement was handwritten and, if considered completely out of context, the greater-than symbol could arguably be read as the number seven. However, in light of the very next line indicating that Hedrick was temporarily and totally disabled — not to mention the remainder of the record — the defendant's apparent reading of the report is patently unreasonable.*

sedentary work only." *Id.* After an appointment in October 2004, Dr. Wright reported:

> [Hedrick] complained of severe back and right lower extremity pain which he continues to rate at 8–10 / 10. He has difficulty sitting for longer than two hours and standing for more than 30 minutes without severe back and right lower extremity complaints. . . .

> His symptoms appear to have progressed to some degree over the past six weeks. He is requesting surgical intervention for his severe back and lower extremity complaints.

> I believe he has achieved maximum medical improvement from nonoperative treatment and may benefit from surgical intervention. It is my opinion that he has approximately a 50% chance of improving his back and lower extremity complaints.

R. at 337. Hedrick underwent additional surgeries on January 14 and 21, 2005, to address the lower back issues. R. at 327–28. In the several follow-up appointments after those surgeries, Hedrick reported that his low back pain was "75%–80% improved," and that his "lower extremity pain has completely resolved," but continued to complain of tailbone and testicular pain. R. at 319, 321–23.

In February 2006, Hedrick was seen by neurologist A.J. Bisson, M.D. R. at 824. Dr. Bisson reported that Hedrick complained of pain in the lower back, right lower extremity, neck, arms, and tailbone. *Id.* Hedrick also complained of bowel and bladder incontinence occurring approximately twice a month. R. at 825. After examination and review of his prior records, Dr. Bisson concluded that "it is realistic to anticipate that this gentleman may well require access to prescription medications [for pain] on a long-term basis." R. at 826. Because of Hedrick's likely long-term needs, Dr. Bisson referred him to pain management specialist Bruce Mackey, M.D., as well as psychologist David Johnson, Ph.D., to consider

weaning Hedrick off narcotics and transitioning him to non-narcotic medications. *Id*. Over the next several appointments with Dr. Bisson, Hedrick continued to complain of severe neck, low back, and testicular pain. R. at 816–23. In March 2004, Dr. Bisson diagnosed Hedrick with "cervical radiculopathy" (essentially neck pain originating from the root of his nerves). R. at 1255. During that period, Dr. Bisson also observed that Hedrick did "not require any type of assistive device to help with gait activities" and that "he is able to move about the room in a relatively easy manner." R. at 817–18, 822, 1081, & 1083.

As a part of his claim for worker's compensation benefits, Hedrick underwent a Functional Capacity Evaluation ("FCE") in December 2005. R. at 548. The FCE results indicated that Hedrick had moderate to significant limitations in flexibility and range of motion in multiple areas resulting in difficulty in ambulation. *Id*. Nonetheless, the FCE results suggest that Hedrick still maintained the ability to move about with some limitations in duration and weight carried. R. at 549.

Beyond the primary treatment for his neck and back, Hedrick saw several other physicians for related problems. In a preoperative evaluation before his lower back surgeries, Hedrick had an abnormal electrocardiogram and was referred to cardiologist Donald Wurzburg, M.D. R. at 277. For his testicular pain, Hedrick was referred by his primary care physician Hubert Rowland, M.D., to urologist Donald L. Wikoff, M.D. R. at 1085. For physical therapy Hedrick saw Shane Holcomb, P.T. R. at 1057–58. The administrative record also contains records and reports from primary care physician Wayne Flatt, D.O.

During Unum's investigation into Hedrick's claim, it sent questionnaires out to the

physicians who treated Hedrick as well as Hedrick himself inquiring into his capabilities with regard to performing ADLs. On April 18, 2005, Hedrick responded answering "No" to the question "Does your current condition prevent you from caring for yourself?" and "No" to the question "Does someone provide assistance?" R. at 251.

The questionnaires sent to the treating physicians posed several questions covering whether Hedrick was able to independently perform the six ADLs listed in the Plan. R. at 668–69. Dr. Flatt responded that "wife helps pt in & out of tub" to both the question whether Hedrick can "safely bathe himself" and whether he can "safely transfer by himself." R. at 668–69. Otherwise, Dr. Flatt responded that Hedrick could complete the ADLs. Dr. Wurzberg responded that Hedrick's wife helps him bathe and dress, but that he could otherwise complete the ADLs by himself. R. at 691–92. Dr. Mackey responded that Hedrick can safely and independently complete all ADLs. R. at 711–12. Dr. Roland responded that Hedrick is unable to safely and independently perform any of the ADLs.[8] R. at 731. When Dr. Roland was later asked about his response by Dr. Krouskop who was conducting the internal review on appeal, Dr. Roland indicated that his responses were based on Hedrick's own reports that his wife had to help complete the ADLs. R. at 1144.

Dr. Bisson initially responded to the questionnaire indicating that Hedrick was unable to bathe, dress, or toilet himself independently, but later informed Unum, through a phone

---

[8] *In its October 25, 2006 letter notifying Hedrick that his appeal had been denied, Unum erroneously wrote that Dr. Roland's response to the questionnaire indicated that Hedrick could safely and independently complete all ADLs. R. at 865.*

conversation with Dr. Krouskop, that those responses were incorrect. R. at 1180. In a subsequent questionnaire, Dr. Bisson reported that Hedrick had not lost the ability to independently complete any of the ADLS, but that he was performing self catheterizations three times a day. R. at 851–52. Dr. Bisson followed up in a letter to Unum on February 14, 2007, writing that Hedrick is able to "transfer independently" and "feed himself independently," and that he does "not require assistive devices with his gait." R. at 1216. However, in a report made a month later on March 14, Dr. Bisson commented that Hedrick "is at a level of [temporary total disability] at this time." R. at 1255.

After several rounds of appeal, review, and denial, Unum medical consultant Dr. Thomas E. Davis found that the case was too close to decide, as noted above, and ordered that an IME be conducted. R. at 1276. After reviewing Hedrick's prior records and conducting her own physical and neurological examinations, Dr. Sharma — who conducted the IME — concluded that:

> [Hedrick] is totally and completely independent in his transfers and completely independent in his gait. Regarding his dressing ability, I feel he is independent in his dressing, but likely may need assistance for his shoes and socks. However, [with] a long handle shoe horn, elastic shoe laces and a sock assist device, he could easily be independent in this activity. Regarding bathing activities, I feel Mr. Hedrick can certainly clean and wash himself. If he is unable to reach his toes or feet, a long handled sponge would certainly make him independent in this area.
>
> Regarding toileting, he is able to come from a sit to a stand position without any assistance. I feel he is able to handle this situation by himself. Regarding feeding and nutrition, once the food has been prepared and made available to him. I am quite certain that the patient can feed himself and get the necessary nutrients from the meals.

R. at 1353. Dr. Sharma further noted that, although "[r]ecords indicated that patient was cathing himself up to three times a day. . . . in my evaluation . . . patient reports he caths himself approximately four times a week." R. at 1353. After receiving the results of the IME, Unum notified Hedrick that the denial of his claim was upheld on appeal. R. at 1359.

In June 2007, the U.S. Social Security Administration ("SSA") approved Hedrick's claim for disability benefits. R. at 1395. Unum agreed to review Hedrick's claim in light of the SSA's decision. R. at 1384. On review by the SSA, the administrative law judge ("ALJ") found that Hedrick has "the residual capacity to stand and/or walk for only a few minutes at a time," that he must "lie down for several hours per day due to pain symptom," and that he is "unable to perform even 'sedentary' activities." *Id.* In light of this, the SSA concluded that Hedrick is "'disabled' as there [were] no jobs existing in significant numbers [he] could perform." R. at 1529. On November 26, 2007, Unum notified Hedrick that his claim had been denied on appeal. R. at 1532. Despite the SSA's ruling in favor of Hedrick, Unum concluded that the ALJ's factual findings did nothing to change its prior conclusion that Hedrick was not unable to independently perform at least two ADLs and, thus, was not eligible for benefits under the Plan. R. at 1527.

## Discussion

As noted above, the court evaluates Unum's decision under the abuse of discretion standard, taking into account its conflict of interest as both administrator and funding entity for the plan. The court concludes, however, that Unum's conflict of interest does not weigh heavily as a "factor" in the analysis in this case, as there is no particular or identified

evidence suggesting a "higher likelihood that it affected [Unum's] benefits decision." <u>Glenn</u>, 128 S.Ct. at 2351. Further, the record indicates Unum took "active steps to reduce potential bias and promote accuracy." *Id.* Specifically, after recognizing this to be a close case following multiple levels of internal review, Unum arranged for an examination to be conducted by an independent physician.[9] The court adjusts the level of deference give to Unum's decision accordingly.

As previously noted,[10] the critical issue is whether Hedrick was "unable to safely and completley perform 2 **activities of daily living** without another person's assistance or verbal cueing."[11] R. at 945 (emphasis in original indicating a "defined" term). The Plan defines six "activities of daily living" as follows:

1. Bathing – washing yourself either in the tub or shower or by sponge bath, with or without equipment or adaptive devices.
2. Dressing – putting on and taking off all garments, and medically necessary braces or artificial limbs usually worn, and fastening or unfastening them.
3. Toileting – getting to and from and on and off the toilet, maintaining a reasonable level of personal hygiene, and caring for clothing.
4. Transferring – moving in and out of a chair or bed with or without

---

[9]*That Hedrick's claim was initially denied and an independent examination ordered only after several levels of appeal serves to reduce, but does not eliminate, the IME's mitigating effect on Unum's conflict of interest. The question ultimately at issue here is whether Unum's final decision was reasonable and sufficiently supported.*

[10]*Hedrick argues the Plan is unfairly ambiguous. While it is true that ambiguities in the policy should be construed against Unum, the drafter, the court is not persuaded the Plan's failure to specifically describe the methods of proof for showing that a participant is unable to perform the listed ADLs makes the plan ambiguous.*

[11]*This determination is made difficult by the fact that his actual ability to perform ADLs has not been the specific focus of the great majority of the physicians' reports in the administrative record.*

equipment such as canes, quad canes, walkers, crutches or grab bars or other support devices.

5. Continence – voluntarily control bowel and bladder functions; or in the event of incontinence, maintaining a reasonable level of personal hygiene.

6. Eating – getting nourishment into your body by any means once it has been prepared and made available to you.

R. at 966.

Hedrick argues that Unum's decision was not supported by substantial evidence. As noted previously, "substantial evidence" in this context is "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker. . . . more than a scintilla but less than a preponderance." Graham, 589 F.3d 1358 (internal citation and quotation marks omitted). Hedrick's arguments to a large extent focus on the various health conditions suffered as a result of his March 2004 injury. It is clear that Hedrick suffered severe injuries resulting in ongoing physical impairments and chronic pain. Nevertheless, Hedrick's entitlement to benefits under the LTD Plan is not controlled by the general severity of his injuries, but by the definitions and other provisions of the Plan. Those definitions and other provisions determine whether he is "disabled" within the meaning of the Plan. The determinative issue here is whether there is a reasonable basis, supported by substantial evidence, for Unum's determination that Hedrick was not unable to "completely and safely perform" two ADLs without the help of another person.

In denying LTD benefits to Hedrick, Unum relied principally on the reports of Dr. Bisson and the IME conducted by Dr. Sharma, both of which concluded that he was able to independently complete the listed ADLs. R. at 1359–65. Their conclusions had some

support in the sometimes conflicting conclusions or observations of plaintiff's other providers. Dr. Bisson treated Hedrick on a regular basis for an extended period with numerous opportunities to personally observe his functional capacity. Dr. Sharma's examination, unlike that of all the other physicians, had the benefit of being specifically directed at evaluating Hedrick's ability to independently complete the ADLs. Though not plaintiff's treating physician, Dr. Sharma's conclusions have support in the record.

Dr. Bisson's reports documenting multiple visits indicate that, although in serious pain, Hedrick was able to move about the exam room "in a relatively easy manner" and that he "did not require any type of assistive device to help with ambulation." R. at 817–18, 1081, & 1083. Dr. Bisson also indicated in the questionnaire submitted to him by Unum that Hedrick was able to independently complete all of the listed ADLs, and later confirmed those responses in a phone conversation with Dr. Krouskop. R. at 1152.

The IME conducted by Dr. Sharma involved a review of Hedrick's medical records and a physical examination which included tests of Hedrick's flexibility, range of motion, and strength. R. at 1346–54. During the examination, Dr. Sharma observed that:

> [Hedrick] was able to get up from the supine position to the sit and from the sit to the stand position and walk[] across [the room] to have [his] weight checked and to step off the weighing machine turn around face opposite to the wall and ha[ve] [his] height checked. All of these activities were done in a very timely and fairly normal fashion. There was no delay in supine to sit to stand, walking, and turning.

R. at 1353. In light of this observation, the physical examination, and her review of Hedrick's prior medical records, Dr. Sharma concluded that Hedrick could independently and

completely perform all of the listed ADLs. *Id.* Though she noted that he might require the use of assistive devices such as "a long handle shoe horn" for dressing or "a long handled sponge" for bathing, use of such devices is included within the Plan's definitions of the ADLs. *Id.*

The record is not without contrary evidence. Four treating physicians responded to Unum's questionnaires indicating that Hedrick was unable to independently perform at least two ADLs, although the particulars were sometimes inconsistent. Hedrick himself has consistently maintained that he cannot perform certain ADLs without the assistance of his wife.

This case presents a close question as to the appropriate result. However, after giving effect to the applicable standard of review and the terms of the Plan, and having taken a "hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest," Fought, 379 F.3d at 1006, the court concludes that Unum's denial of coverage was not arbitrary and capricious. Its determination that Hedrick was not eligible for continued benefits beyond 12 months was supported by substantial evidence. Accordingly, judgment will be entered in favor of the defendant and against the plaintiff.

**IT IS SO ORDERED**.

Dated this 4th day of March, 2010.

JOE HEATON
UNITED STATES DISTRICT JUDGE